1

1      IN THE UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF TENNESSEE
2   _ _ _ _ _ _ _ _ _ _ _ _ _ _ X

3   UNITED STATES OF AMERICA      : NO. 10-CR-20194    (SHM)
                    PLAINTIFF,     :
4                                  :
              VS.                  : UNITED STATES COURTHOUSE
5                                  : MEMPHIS, TENNESSEE
                                   :
6   WILLIAM HARNESS                : JANUARY 26, 2012
                    DEFENDANT.     : 10:00 A.M.
7   _ _ _ _ _ _ _ _ _ _ _ _ _ _ X

8

9

10

11         CRIMINAL CAUSE FOR SENTENCING
         BEFORE THE HONORABLE SAMUEL H. MAYS
12        UNITED STATES DISTRICT COURT JUDGE

13              _ _ _ _ _

14          A P P E A R A N C E S:

15

16  FOR THE GOVERNMENT:            U.S. ATTORNEY'S OFFICE
                                   FEDERAL BUILDING
17                                 167 NORTH MAIN, STE. 800
                                   MEMPHIS, TENNESSEE 38103
18                                 BY:  JERRY KITCHEN, ESQ.

19  FOR DEFENDANT HARNESS:         FEDERAL PUBLIC DEFENDER
                                   200 JEFFERSON, STE. 200
20                                 MEMPHIS, TN  38103
                                   BY:  DAVID BELL, ESQ.

21

22         NICOLE M. WARREN, RMR, CRR
               OFFICIAL REPORTER

23

    Proceedings recorded by computerized stenography
24  Transcript produced by Computer-aided Transcription.

25

UNREDACTED TRANSCRIPT

2

1                    E X H I B I T   I N D E X

2

EXHIBIT NUMBER                         RECEIVED

3

4    Exhibit No. 1    DVD                    51

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

1               (In open court; all counsel and

2     Defendant William Harness present.)

3               THE COURT:  United States against William

4     Harness.

5               Mr. Kitchen, Mr. Bell.

6               Are you ready to go forward, Mr. Kitchen?

7               MR. KITCHEN:  Yes, sir, your Honor.

8               THE COURT:  Are you ready, Mr. Bell?

9               MR. BELL:  Yes, your Honor.

10              THE COURT:  Let us proceed.  Okay.

11              Mr. Bell, you've reviewed the presentence

12    report in this case and filed your position; is that

13    correct?

14              MR. BELL:  That's right, your Honor.

15              THE COURT:  Mr. Kitchen, you have reviewed the

16    presentence report and filed your position; is that

17    correct?

18              MR. KITCHEN:  Yes, sir, your Honor.

19              THE COURT:  Mr. Harness, have you reviewed the

20    Presentence Investigation Report in your case?

21              THE DEFENDANT:  Yes, your Honor.

22              THE COURT:  Have you discussed it with your

23    attorney?

24              THE DEFENDANT:  Yes, your Honor.

25              THE COURT:  Do you have any objection to the

4

1    report, Mr. Kitchen?

2             MR. KITCHEN:  No, your Honor.

3             THE COURT:  What about the facts, Mr. Bell?  Do

4    you have any objections to the Presentence Investigation

5    Report as filed with the Court?

6             MR. BELL:  Your Honor, the only, if you recall

7    from the position paper, the only thing I had an issue

8    with is really a distinction without a difference.

9             THE COURT:  What about the facts?  Are there

10    factual issues?

11             MR. BELL:  Not in terms of the facts of this

12    case, no, your Honor.

13             THE COURT:  All right.  Well, are there factual

14    issues in terms of the facts stated in the presentence

15    report?

16             MR. BELL:  We do not dispute that those are the

17    facts that the officers have alleged in the Davidson

18    County case.

19             THE COURT:  All right.

20             MR. BELL:  Does that make sense, your Honor?

21    I'm trying to be as clear as I can.

22             THE COURT:  You do not dispute the facts as

23    stated in paragraphs 22 and 23.

24             MR. BELL:  Your Honor, that case is still

25    pending in Davidson County.

UNREDACTED TRANSCRIPT

1          THE COURT:  Well, I understand that.  I'm just

2    asking you a straightforward question.  Do you dispute the

3    facts or not?

4          MR. BELL:  I do not dispute that those are the

5    facts that the police officers have stated.

6          THE COURT:  All right.  There's no dispute

7    about the facts in paragraphs 22 and 23.  Therefore, the

8    Court will accept the Presentence Investigation Report as

9    its findings of fact.

10          What about the guideline calculations,

11   Mr. Bell?

12          MR. BELL:  No objection, your Honor.

13          THE COURT:  The Court will adopt the guideline

14   calculations of the presentence report as its conclusions

15   of law.

16          What about acceptance, Mr. Kitchen?

17          MR. KITCHEN:  We agree to the third level of

18   acceptance, your Honor.

19          THE COURT:  You move for the third level?

20          MR. KITCHEN:  Yes, sir.

21          THE COURT:  That's granted.

22          We're under the 2011 Guideline Manual,

23   Mr. Bell?

24          MR. BELL:  We are, your Honor.

25          THE COURT:  Mr. Kitchen?

UNREDACTED TRANSCRIPT

 1              MR. KITCHEN:  Yes, sir.

 2              THE COURT:  Probation?

 3              PROBATION OFFICER:  Yes, your Honor.

 4              THE COURT:  All right.  So, that's 57 to 71

 5   months of custody based on a Total Offense Level 23;

 6   Criminal History Category III; supervised release not less

 7   than three years; supervise -- well, fine $10,000 to

 8   $1 million; restitution not applicable; mandatory special

 9   assessment of $100.

10              Is that your understanding of where we are,

11   Mr. Bell?

12              MR. BELL:  Yes, it is, your Honor.

13              THE COURT:  Mr. Kitchen?

14              MR. KITCHEN:  Yes, sir.

15              THE COURT:  Probation.

16              PROBATION OFFICER:  Yes, your Honor.

17              THE COURT:  All right.  Mr. Bell, we've

18   established, I think, we're under the 2011 Guideline

19   Manual.

20              MR. BELL:  That's right.

21              THE COURT:  All right.  Let's go.

22              MR. BELL:  First of all, good morning, your

23   Honor.

24              THE COURT:  Good morning to you.

25              I've already said good morning to you.  Am I

1    supposed to say good morning to you twice?

2         MR. BELL:  I don't know that I have, your

3    Honor.  So, I just wanted to make that sure I greeted you

4    properly, your Honor.

5         And may it please the Court --

6         THE COURT:  I feel properly greeted.

7         Go ahead.

8         MR. BELL:  Thank you, your Honor.

9         Before we get started, I wanted to point out

10   that there is a large crowd here for Mr. Harness; and I

11   wanted to give your Honor some of the names.  I'm going to

12   be emailing all of the full names to the court reporter

13   later just to make sure that she gets everything, but in

14   the audience today we have Jason DeFord who is a best

15   friend of Mr. Harness.

16        We have his daughter, Brianna; his son, Little

17   William; his daughter, Innocense; and his daughter,

18   Curtisee; and then his son, Little Waylon.  They're all

19   here before the Court.  Those his five children that I

20   know the Court is well aware of from the presentence

21   report and the position paper.

22        We also have his wife here, Ms. Candace

23   Harness.  She's in the front row closest to the aisle with

24   one of their children.

25        We also have, interestingly -- I think the

UNREDACTED TRANSCRIPT

1    Court should take note of this -- we have Stephanie Hayes
2    here who is the mother of Mr. Harness's first two
3    children; and she's come here in support as well.
4           We also have some other friends and cousins.
5    Cody Hess is a friend who's here.  Nicole Tinin is a
6    cousin who's here.  Belinda McCoy is a friend.  Ashley
7    Minguez is a friend who also is one of the individuals who
8    had sent a letter in that I filed as one of the
9    attachments to the position paper.
10          We have Hector Reyes and Edward Crowe, both of
11   whom submitted letters as well; Chris Gray who's a friend
12   as well; Tiffany Stacey who's a friend; Melissa Cowell
13   who's a friend.
14          And we actually have an individual named Junior
15   Stewart who is here.  He's back in the middle in the blue
16   shirt who Mr. Harness doesn't know but who is simply a fan
17   of him as a musician, who just decided to come for the
18   hearing today.
19          So, we have quite a bit of family and friend
20   support who are here for Mr. Harness.
21          THE COURT:  Well, welcome to all of you.  It's
22   a pleasure to have you in court this morning.  Thanks for
23   coming.
24          Go ahead, Mr. Bell.
25          MR. BELL:  Yes, your Honor.

UNREDACTED TRANSCRIPT

1          Your Honor, Mr. Harness stands before you as an

2    individual who committed the crime that he's been charged

3    with.  As you know, he not only told the Court when he

4    came in and pled guilty but he also told the police when

5    they were interrogating him and he told the probation

6    officer when we did our interview that he was guilty of

7    this crime and that he committed this crime.

8          There is no issue about whether he -- whether

9    he did this or not.  Of course, we know that the crime

10   involves the attempted purchase of a number of Oxycodone

11   pills.  Oxycodone, as your Honor knows, is a drug that for

12   a long time was simply used for pain relief but in

13   increasing years has been used by people in more of a

14   recreational fashion.

15         As your Honor knows from reading the

16   presentence report, Mr. Harness told the probation officer

17   that he's had a long history of taking Oxycodone, sort of

18   a self-medication, and that he is addicted to that drug.

19         It all started in terms of the drug and the

20   substance abuse issues probably back at the point where

21   Mr. Harness was an adolescent boy and his father, when he

22   was age 11, Mr. Harness was age 11, committed suicide.

23   While his relationship with his father had been tenuous at

24   best and he had had an on-and-off-again relationship with

25   him, that incident, that event in his life seemed to spark

something where Mr. Harness started to experiment with alcohol, experiment with marijuana, argue with his mother, have issues back and forth, and ended up in a situation where by the time he was 16, between 16 and 17 years old he was living with an uncle, he was getting in some trouble with the juvenile authorities, and he was using drugs.

This continued for a period of time until he began to get arrested as a young adult; and as your Honor knows, he got some misdemeanor charges.  He was charged with possession of a weapon charge, theft of property charge, some misdemeanor drug charge; and then he received a sentence for a felony drug charge when he was about 20 years old.

And at that point he was a young man who was using drugs on a regular basis, who was getting in trouble with the law, and who was sent to prison; and he was pretty much in a position of trying to figure out how to turn things around.

And the good part of this aspect of the story is that he started taking some classes.  He took domestic violence classes and completed a program.  He went and took a substance abuse program and completed a certain portion of that and then was doing well.

And after release, Mr. Harness began to work

1     and he worked first for a -- at a -- in a country club as

2     sort of an apprentice to a chef there where he learned how

3     to run banquets and he learned how to cook and he learned

4     how to be a chef.  After that, he was hired to be a

5     restaurant kitchen manager at a place called I believe it

6     was Joe's Diner, if I'm not incorrect.

7             THE DEFENDANT:  (Nods head affirmatively.)

8             MR. BELL:  So, we have this person who is

9     really struggling in his early times and is sent to

10    prison.  When he gets out, he starts to work and he starts

11    to do well and he's staying off of the drugs and he is

12    starting to form a life, a productive life, and he spends

13    four or five years doing this and it works really well.

14            But there was something more in Mr. Harness'

15    background where he had this love for music.  Part of it

16    is probably based on his family, his exposure to music.

17    Part of it was based on his talent, and he was signed to a

18    record contract I believe in 2006.

19            THE DEFENDANT:  '8.  2008.

20            MR. BELL:  I believe the first record

21    contract --

22            THE DEFENDANT:  Yeah, 2006.

23            MR. BELL:  -- was 2006 with the original record

24    company, the one that was -- that went bankrupt.

25            And he began to get involved in the record

1   industry and the music industry and, of course, we know

2   Mr. Harness is from around the Nashville area and we know

3   that he was -- he was a person who actually got signed as

4   an artist.

5          Of course, along with being signed as an

6   artist, he was required to go start making recordings and

7   start touring and playing shows; and unfortunately for

8   Mr. Harness and for his family, he fell back into his old

9   pattern of substance abuse.  He started to use these pills

10  again, most specifically oxycodone, the same pill that is

11  involved in this case.

12          It's unfortunate because, while on the one hand

13  Mr. Harness was being very successful and trying to be a

14  good, a good recording artist and be a successful

15  musician, he was struggling in his personal life with this

16  addiction.  Yet at the same time he was also helping to

17  support his first two children and he was starting a

18  family where he had three more children as well.

19          So, it's a difficult situation because

20  Mr. Harness has been successful.  He's done some really

21  great things and we know that he can be a successful and

22  productive member of society but when he was first exposed

23  to the music industry, he fell back into that same pattern

24  of substance abuse that he had been in before.

25          Where that substance abuse comes from it's hard

1    to really define.  I'm certainly not a psychiatrist or a

2    psychologist by any stretch of the imagination, but I

3    would say that it is telling that after his father's

4    suicide he starts to use substances on a regular basis.  I

5    would say that the struggles that he went through when he

6    was first growing up were -- probably had some sort of

7    impact on it as well.

8              Of course, we recounted both in the position

9    paper and the presentence report how his mother was a

10   strong, independent woman who basically raised her mostly

11   by herself -- raised him mostly by herself.  While she had

12   available to her probably any number of resources, having

13   as her stepfather the famous Waylon Jennings, a country

14   musician, on the other hand she was so independent that

15   she really didn't want to accept any help.

16             So, Mr. Harness would flip back and forth

17   between going to visit his famous relatives who had lots

18   of money and were very wealthy and then going back to

19   where his mother lived in more impoverished settings in

20   the trailer park and places like that and sometimes

21   Government type housing.

22             It's this strange dichotomy that Mr. Harness

23   was exposed to at a very early age.  So, somewhere along

24   the way we know from looking at the presentence report

25   that Mr. Harness when he was in cus -- incarcerated as a

1   young man was diagnosed with Posttraumatic Stress

2   Disorder, although he was never actually treated for that.

3            So, what I would submit to the Court that part

4   of what Mr. Harness may have been doing was trying to

5   self-medicate by using some of these drugs because of the

6   issues that he had had in the past and the mental health

7   diagnosis that he had gotten and that Posttraumatic Stress

8   Disorder probably had a lot to do with his father and it

9   had a lot to do with his family upbringing.

10           All that being said, none of these are excuses

11  for why Mr. Harness committed this crime.  He committed

12  this crime because he was a drug addict, because he wanted

13  to buy these pills; and he was the one who talked to the

14  undercover agent or the CI, as it might be said.  He was

15  the one who arranged the deal, and he was the one that had

16  someone drive him there to purchase these pills.  There's

17  no putting that on someone else.  There's no allegation

18  that he was not competent in the time when that happened.

19  He did this, and he is going to be punished for it.  We

20  know that.

21           But we know that Mr. Harness not only can be

22  successful -- he's signed to a record contract, is paid

23  regularly -- but also that he has a family and friends

24  that support him greatly and you can see that by seeing

25  them all here today.

1              And we know that when he was originally

2    arrested on this case, as you –– as your Honor knows from

3    the Pretrial Services Report that was originally submitted

4    but also the one that was submitted just a couple of days

5    ago, the pretrial services in Nashville told the Court ––

6              THE COURT:  What do you mean the one that was

7    submitted a couple of days ago?

8              MR. BELL:  We just had one that was filed a

9    couple of days ago.

10             THE COURT:  What was that one?  Are you talking

11   about the addendum?

12             MR. BELL:  I'm sorry.  I'm talking about the

13   pretrial services report, not the presentence report.

14             THE COURT:  Oh, you're talking about

15   Document 50 that was filed on the 24th.

16             MR. BELL:  That's right, Your Honor, a couple

17   of days ago.

18             THE COURT:  All right.

19             MR. BELL:  Yes, your Honor.  I apologize for

20   not ––

21             THE COURT:  No, you made it clear.  I just

22   didn't understand you.

23             MR. BELL:  Okay.  But one of the interesting

24   things about that document was that pretrial services said

25   that after he had been arrested originally on this case

1    that they had submitted him over to go to substance abuse

2    treatment and that he had been faithfully going to that

3    treatment and he had been faithfully testing negative for

4    controlled substances.

5            So, what that should show the Court is that he

6    had the ability under the right scenario with the correct

7    supervision to stay clean and to continue to support his

8    family.

9            Now, I would submit again I know your Honor has

10   received the letters.  I have an extra copy of the letters

11   that were submitted with the position paper, if I could

12   submit those.

13           THE COURT:  Unless you have --

14           MR. BELL:  There's nothing different.

15           THE COURT:  I've read them all.

16           MR. BELL:  Thank you, your Honor.

17           And the letters outline an individual that many

18   people, some here but many others including the former

19   interim director of the Tennessee Sheriff's Association

20   and other individuals, really think he has a lot of

21   potential and has been a good friend and a good father.

22           That kind of support should show your Honor

23   that the community believes that Mr. Harness can still be

24   a productive member of society both during his punishment,

25   what he receives for his sentence, but also afterwards.

1        And I would just point out that the Court often
2   looks at an individual certainly from the presentence
3   report and when reading the allegations -- and in this
4   case they aren't just allegations.  They are facts.  He
5   did commit this crime.  This was a crime that involved
6   trying to buy pills, involved trying to buy drugs.
7   There's no allegation that a firearm was possessed here.
8   There's no allegation that any crime of violence was
9   enacted here.  It was an attempted drug purchase.

10        I also want to point out to the Court that
11  Mr. Harness is more than just the perpetrator of this
12  crime.  He's a father and he's a husband and he's an
13  individual who cares for his family and supports his
14  family and who has people to stand up for him.

15        So, I'd ask your Honor to take all that into
16  consideration when determining the correct sentence.

17        Of course, I believe that Mr. Harness is an
18  individual who could benefit well from an alternative to
19  incarceration.  I believe that the Court can construct an
20  alternative to incarceration that would allow him to
21  continue working and supporting his family while being
22  monitored heavily by pretrial -- by the probation office,
23  have him regularly going to substance abuse classes, have
24  him on electronic monitoring where the Court is able to
25  know when and where he leaves his house and where he's

1    going and get approval for those types of things, and also

2    the possibility of going to a halfway house.

3               In addition, I would say that something along

4    the line of a class in Moral Reconation Therapy would be a

5    good idea for Mr. Harness because it would help him to

6    realize about good and bad decision-making.  I think that

7    since he has -- that a person with five children who has

8    to support those children can always be reminded of those

9    things.

10              It's up to the Court and I ask that the Court

11   listen to the witness -- we have a few witnesses who just

12   want to make statements -- but also to Mr. Harness to

13   determine whether he really accepts responsibility for

14   this and what the proper sentence should be.

15              THE COURT:  Go ahead.

16              MR. BELL:  If I could call Ms. Candace Harness.

17              Should I get the microphone, your Honor?

18              THE COURT:  That's fine.  The microphone I'm

19   sure would be helpful.

20              You have to turn it on.

21              I forgot your extensive experience with

22   microphones.

23              MR. BELL:  I do, your Honor.  Thank you.

24              (Candace Harness approaches.)

25              THE COURT:  Good morning.

 1              MS. HARNESS:  Good morning.

 2              THE COURT:  Tell me your name.

 3              MS. HARNESS:  Candace Harness.

 4              THE COURT:  How do you spell your name?

 5              MS. HARNESS:  C-a-n-d-a-c-e, H-a-r-n-e-s-s.

 6              THE COURT:  All right.  What do you have to

 7    say, Ms. Harness?

 8                  How are you related to the defendant?

 9              MS. HARNESS:  He's my husband eight years now.

10    Um, he's just the best man I know.  He's always been

11    committed to me and his children and his career and he's

12    just a really great guy and there's not many great men out

13    here and he is one of those men.

14                  He made mistakes and, um, I agree he should

15    learn from those mistakes but, above all, he is a

16    wonderful person and I'm not just saying that 'cause he's

17    my husband.  He's just -- he's just that guy.  He's a

18    wonderful person.

19              THE COURT:  Thank you, Ms. Harness.

20              MS. HARNESS:  You're welcome.

21                  Thank you, your Honor.

22              (Candace Harness returns to the gallery.)

23              MR. BELL:  Your Honor, I'd also like to call

24    Stephanie Hayes.

25                  (Stephanie Hayes approaches.)

1          THE COURT:  Good morning, Ms. Hayes.

2          MS. HAYES:  Good morning.

3          THE COURT:  Now, tell me how to spell your

4   name.

5          MS. HAYES:  S-t-e-p-h-a-n-i-e, H-a-y-e-s.

6          THE COURT:  Okay.  What do you want to say?

7          MS. HAYES:  He's just such a good person, he's

8   such a good dad, and he's always committed to his family

9   and his kids.  And we have such a good relationship, me

10  and him and me and his wife and his other three children.

11          And I just ask that you can be as lenient as

12  possible 'cause he's a really wonderful person.

13          THE COURT:  Tell me about a little about

14  your -- how do you know the defendant?

15          MS. HAYES:  I have two children by him.

16          THE COURT:  You're the mother of two of his

17  children; is that right?

18          MS. HAYES:  Yes, sir.

19          THE COURT:  So, you've known him a long time.

20          MS. HAYES:  Yes.

21          THE COURT:  Anything else you want to tell me?

22          MS. HAYES:  No, sir.

23          THE COURT:  Thank you, Ms. Hayes.

24          MS. HAYES:  Thank you.

25          (Stephanie Hayes returns to the gallery.)

1        MR. BELL:  And, your Honor, finally we have

2   Jason DeFord.

3           (Jason DeFord approaches.)

4        THE COURT:  Good morning, Mr. DeFord.

5        MR. DeFORD:  Good morning, Judge.

6        THE COURT:  How are you this morning?

7        MR. DeFORD:  I'm a little nervous.

8        THE COURT:  Well, don't be.

9        MR. DeFORD:  For the record, my name is Jason

10   DeFord, D-e-F-o-r-d.

11        THE COURT:  Capital F?

12        MR. DeFORD:  Capital "F" actually.  Thank you.

13        THE COURT:  All right.

14        MR. DeFORD:  That's why it's DeFord, not

15   "Deford."  My dad gets so mad about that.

16        THE COURT:  Well, fathers are that way

17   sometimes.

18        MR. DeFORD:  He said our last name's all we're

19   going to have when it's all said and done.

20        THE COURT:  So, how do you know the defendant?

21        MR. DeFORD:  He's been my best friend for about

22   a decade.

23        THE COURT:  Okay.  What do you want to tell me?

24        MR. DeFORD:  Your Honor, I can sit up here and

25   name a lot of attributes.  We could pass this microphone

UNREDACTED TRANSCRIPT

1   around, and none of us are gonna say nothing you don't

2   expect us to say.

3              But of all the stories we could tell about Will

4   Harness and all the things we know about his drug

5   addiction and his problems, one story you won't hear is

6   him being a bad father; and I don't mean a man that throws

7   money at a kid.  I mean a man that wakes up every day and

8   takes them to school.  Every one of them kids know

9   everything about their daddy from his smile to every

10  tattoo on his body.  There's just not many fathers like

11  that.

12             I was blessed to have one, but I know everybody

13  else in this courtroom with me didn't.

14             That's all I have.

15             THE COURT:  Thank you, Mr. DeFord.

16             (Jason DeFord returns to the gallery.)

17             THE COURT:  Mr. Bell.

18             MR. BELL:  Your Honor, I know Mr. Harness wants

19  to address the Court.  Then we have a short DVD to play.

20             THE COURT:  All right.  I'd just as soon have

21  the video before Mr. Harness allocates -- allocutes.

22             MR. BELL:  Yes, your Honor.

23             (DVD played in open court.)

24             MR. BELL:  Your Honor, Mr. Harness.

25             THE COURT:  What's that?

1          MR. BELL:  Mr. Harness.

2          THE COURT:  Mr. Harness, do you wish to be

3   heard on your own behalf?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  Go forward.

6          THE DEFENDANT:  I'm choked up from everybody

7   talking.

8          Um, I know I made some bad decisions.  I made

9   some mistakes and I know that I have to pay the

10   consequences for them and I'm completely at peace with

11   that.  Just ready to get home and be a father, a husband,

12   a better one and just move on from this, tell my story so

13   others, you know, won't hopefully make the same decisions

14   I've made, the same mistakes, and give my children what I

15   didn't have.  That's a father.

16          THE COURT:  Mr. Kitchen.

17          MR. KITCHEN:  Your Honor, this case is simply

18   not any different than I would submit that the Court has

19   not heard time and time again.

20          The defendant is a little different in one

21   respect.  He has numerous people here to support the

22   defendant.  He does appear to have come from a good family

23   in that he has had support from his family.  He has had

24   financial support, it appears.  He is not someone who has

25   come from the projects or someone who's come from a

1    background where he is not privileged.  He is an

2    individual who has family support, children, someone that

3    he has a reason to live and succeed and to take care of

4    his family.

5         As you've heard, he has individuals that depend

6    on him and yet this defendant from a juvenile, it appears

7    from his report, has chosen to commit crimes time and time

8    again.  It would be interesting to note the number of

9    times that these individuals -- and I don't disparage the

10   family because the family's family.  They're the ones that

11   pay the price, it appears, all the time when loved ones go

12   to jail or who's in trouble.

13        They come to court, whether it's state court or

14   Federal court, they come to court time and time again and

15   beg for mercy because they don't want their loved one to

16   go to jail and they come and tell how good a person the

17   defendant is.  Each time he gets in trouble, they bail him

18   out.  They pay the money to get him out of jail.  He goes

19   back and continues to violate the law.

20        This defendant's been in trouble time and time

21   again and yet it'd be interesting to note how many times

22   this defendant's family has come and told the judge every

23   time that he's been in trouble he's really a good person.

24   He has a good family.  He takes care of his family.  We

25   love him.  He's good person.  He takes care of his kids.

He's a good father.  He knows his family well.  His kids just, as Mr. DeFord said, he -- he knows all about them.

I'm sure he is a good father but they're the ones that are going to suffer and it's unfortunate.  They always are the ones that suffer and we hear the sad stories about how they're going to suffer and they put it on the judge, they put it on the Court to make the Court feel as if it's going to be the Court's fault that the Court's going to sentence this man to jail instead of it's the defendant's fault.

It's the defendant's fault why he's standing here, not the Court's fault; but the family wants the Court to feel like now if the Court sends the defendant to jail, then it's your fault.

Well, no, it's the defendant's fault.  He shoulda learned his lesson back when he was 16 after he was arrested for aggravated assault and aggravated kidnapping when they took him to juvenile court and he got in trouble and that petition was sustained and the Court lectured him then, I'm sure, and his family was present but he didn't.  He got in trouble again.

And then as a juvenile he was arrested again and he got in trouble again and a petition was sustained.

No, but he continued again.  He got arrested again for unlawful possession of a weapon and he was

1   convicted of that and that weapon was -- he was in a

2   vehicle that was suspected in a robbery.  This defendant

3   went down a different path.  Not only was that vehicle

4   that he was in was suspected of a robbery but there was a

5   loaded handgun in that vehicle when he was 18.  He didn't

6   stop then.

7          He then was arrested for burglary of a motor

8   vehicle and theft of property.  I'm sure those people that

9   were victims of that crime would be here, too, wanting to

10  know, well, now that he's continued on this life of crime,

11  what's happened to Mr. Harness?  Why isn't he paying the

12  price?  Is it just that the family has to come in here and

13  beg for mercy and nothing continues to happen to

14  Mr. Harness?  Because nothing so far has happened to

15  Mr. Harness.

16         But then in 1999 when he got this burglary of a

17  motor vehicle, what'd they do?  They just gave him a

18  misdemeanor.  How much time did he serve then, or did the

19  family come in and beg for mercy then and say that he was

20  a good person then?

21         Then after that, then what does he do?  He goes

22  to selling drugs.  He gets caught for possession of a

23  controlled substance with intent to sell, and he gets a

24  misdemeanor again.  Did the family come in and beg for

25  mercy then?  We don't know.

UNREDACTED TRANSCRIPT

1        But I know in state court that's what happens.
2   The family comes in.  They have a probation hearing.  You
3   come in and ask for probation.  You get probation.
4        But then in this particular case, Judge, after
5   he was put on probation, it's revoked.  It's revoked after
6   the defendant was charged with selling Lortab and he had
7   brass knuckles and he also had a weapon in that charge as
8   well.  So, this defendant was not just an individual.
9   This is when he was 21 years of age.  So, he wasn't just a
10  juvenile.  He wasn't just a young man.  He was someone who
11  knew better.
12       He came from a family -- he knew better at that
13  point and he was a man that was on his way, knowing that
14  he had a family.  He knew better.  He knew he needed to be
15  on the right path but he chose to continue to sell drugs
16  and he was carrying weapons while he was selling drugs but
17  yet he gets a misdemeanor.
18       If the law had been strong on Mr. Harness at
19  that time, maybe he wouldn't be here today; but they
20  slapped him on the wrist.  Then while he got slapped on
21  the wrist, his probation is violated.
22       He then didn't learn his lesson from that.  He
23  then goes out and commits more crimes.  He's arrested
24  again for possession of a weapon again.  So, jail didn't
25  teach him a lesson even after being revoked again.

UNREDACTED TRANSCRIPT

1          He gets arrested again.  A capias is issued for

2    him for failure to appear.

3          He then back in 2001 in December he's arrested

4    while he's on probation.  So, even the rules that the

5    judge told him while he was on probation didn't mean

6    anything to Mr. Harness.  The law didn't mean anything to

7    Mr. Harness.  He just continued to do as he pleased.

8          He's arrested then for selling marijuana and

9    reckless endangerment.  Instead of Mr. Harness realizing

10   that committing -- violating the law is a serious

11   business, what does he do?  He flees from the police, and

12   he could kill somebody.  And what happens to him then?  He

13   gets three years.  He's selling marijuana at this point

14   and he's fleeing from the police and he sold five Lortab

15   pills and a quarter pound of marijuana to an undercover

16   agent.

17         So, not only does Mr. Harness come in here and

18   try to -- and Mr. Bell tells the Court, well, he's not

19   giving us excuses.  That's exactly all he's doing is

20   giving this Court excuses of why he was committing crimes.

21   He was a drug dealer.  That's what he is is a drug dealer

22   but he comes in here and wants to give the Court this sob

23   story about his past life.

24         Everybody has problems, but they don't use

25   those problems to become a drug dealer and commit crimes.

1    They go get help, but they don't commit crimes because
2    they have a hard life.  They don't turn to going around
3    and running from the police and selling drugs.
4          So, what did this defendant do?  He then
5    decides that he's going to sell some more Lortabs.  He
6    makes arrangements to sell thousands of Lortabs.  He tells
7    the undercover agent when he is making this particular
8    deal, Judge, not that he's just some user but he tells
9    this undercover officer that he makes five to $10,000 a
10   week and he's -- he needs five to 10,000 Lortabs.
11         And Mr. Bell indicated that this wasn't a
12   violent crime.  Well, we don't know he because he was
13   arrested before it ended; but he'd indicated that he was
14   going to snatch the pills from the informant because he
15   didn't have enough money to pay for all the pills at this
16   particular time.
17         Now, in addition, I know Mr. Bell had used this
18   as an indicator of his cooperation; but Mr. Harness also
19   did state as this is a favorable indication on the
20   defendant's behalf that was his cooperation.  Well, the
21   defendant also stated that he knew how the system worked
22   because he has done it in the past, that when he got
23   arrested in the past that he used that by cooperating with
24   the Government in the past by giving statements to law
25   enforcement when he was arrested before.

1        So, he knew how the system worked.  So, he

2  agreed to cooperate with the Government when he was

3  arrested.  So, that's -- so, he gave a statement.

4        What else is even telling after that, your

5  Honor, here he is arrested on this particular case with

6  the DEA agent on a Federal case and then we have this

7  relevant conduct offense where which occurred -- this

8  offense occurred in March and here the defendant is now

9  involved in another wiretap case that's taking place where

10  there's recorded conversations with the defendant that's

11  occurring between November 10th of 2010 and January 15th

12  of 2011.  That's just -- that's just recently.  That's not

13  that far off.  That's not that far ago.

14        And he's a changed man now?  No, he's just

15  here, telling the judge now what he needs to say.  His

16  family's telling the judge what he just needs to say so

17  that he can get a leaner sentence.

18        The only thing that's going to teach this

19  defendant anything is just punishment, just deterrence,

20  and a sentence that does not depreciate the seriousness of

21  this offense.

22        He has gotten away with it in the past and

23  before and the only thing that's going to teach this

24  defendant not to continue on his criminal ways is jail and

25  that is a deterrent.  That's what Mr. Bell indicated what

1   kept the defendant from using drugs before was that he

2   knew if he tested positive, he would go to jail while he

3   was on pretrial release.

4          And I would submit that he needs to be taught a

5   lesson; and the only lesson that's going to do that is to

6   send him to jail, that there's no more excuses.

7          THE COURT:  Probation.

8          PROBATION OFFICER:  I have nothing to add, your

9   Honor.

10         THE COURT:  Mr. Bell.

11         MR. BELL:  November, 2002, to March, 2010, your

12  Honor.  November, 2002, is when Mr. Harness was released

13  out of Davidson County from serving his sentence.

14  March, 2010, is when this occurred.  During that period of

15  time there's nothing in the presentence report about any

16  criminal activity aside from the allegations involved in

17  Davidson County.

18         So, while Mr. Kitchen likes to come up and talk

19  about my client's criminal history —— and he has one;

20  there's no running from it —— there was a stretch of time

21  there where Mr. Harness was not getting in trouble.  So,

22  the habitual offender that Mr. Kitchen wants to make my

23  client out to be is not 100 percent accurate.

24         That being said, my client committed this

25  crime.  There was no firearm found in this crime.  There

1   was no snatching of the pills.  That never happened.

2   There was no act of violence.  That never happened.  So,

3   let's be straight about what actually happened.

4         All that being said, Mr. Harness did this and

5   he will pay the punishment for it but the fact that he has

6   a criminal history, the fact that he's been in trouble

7   before does not take away that Mr. Harness is a person

8   that can still be saved, is a person that can still be a

9   productive member of society, is a person that can support

10  his family, and is a person who has the kind of family

11  support that can make him be a valued member of this

12  community.

13        So, we'd ask your Honor to take that into

14  account when determining what the proper sentence is.

15        Thank you.

16        THE COURT:  This is the case of United States

17  of America against William Harness.

18        Mr. Harness has pled guilty to Count One of the

19  indictment against him, conspiracy to possess with intent

20  to distribute oxycodone, a Schedule II controlled

21  substance.  That's a Class C felony.  It's a violation of

22  21, United States Code, Section 846.

23        The penalties for that offense are not more

24  than 20 years in prison; not more than a 1 million-dollar

25  fine; not less than three years of supervised release; and

1    there's a mandatory special assessment of $100.

2              I've made all findings of fact necessary to

3    apply the guidelines in this case.  There is no dispute

4    about the facts in this case, although there is some

5    disagreement about the implications of the facts.

6              I've calculated the guideline sentencing range

7    correctly.  There's no dispute about the guideline

8    sentencing range.  I have the discretion to issue a

9    sentence that varies from the guidelines.  My goal is to

10   impose a sentence that is sufficient but not greater than

11   necessary to comply with the purposes of

12   18, United States Code, Section 3553.

13             To that end, I am to consider the 3553 factors

14   in exercising my independent judgment about what an

15   appropriate sentence should be.  I am limited in my

16   discretion by the maximum statutory penalty for custody

17   purposes which is 20 years in prison.  I'm also limited by

18   the minimum statutory provision for supervised release

19   which is three years.

20             This is a very serious crime.  Mr. Harness

21   chose to become involved in the distribution of oxycodone.

22   The record is clear that it was not the first occasion he

23   had been involved in distributing oxycodone.  Mr. Harness

24   was the key player in this particular crime.  He made

25   arrangements for the purchase of the pills.  He made that

arrangement with a confidential source.  He recruited his

friend to drive him to Memphis, Tennessee, to purchase the

drugs.  The friend, I believe, was Mr. Taylor.

In any event, Mr. Harness himself was not

supposed to be driving because I think he didn't have a

license.  So, Mr. Taylor was the one who drove; and

Mr. Harness also recruited his brother-in-law, I believe,

Mr. Dile, D-i-l-e, who became involved in the matter as

well.

They drove to Bartlett, Tennessee; went to a

Wal-Mart; and at that point sought to purchase,

Mr. Harness sought to purchase 400 Oxycontin pills.  The

exact role of Mr. Dile and Mr. Taylor here is unclear.

There's some indication that Mr. Harness told them that

they were all going down to Tunica, presumably to gamble;

but, in fact, that's not what they were doing, although at

the time of the arrest or thereabouts, Mr. Dile was in the

Wal-Mart apparently with some money and returned with the

money.

Now, the Oxycontin was obviously a substantial

amount; and the cost of it was substantial as well.  The

original agreement was to purchase 500 Oxycontin pills for

$11,500.  So, we have here a major drug transaction.  This

was not a crime of opportunity.  That is, Mr. Harness

didn't happen upon it or happen upon the occasion.  He

1   created the occasion himself and drove over 200 miles to

2   accomplish it or got someone to drive him over 200 miles

3   to accomplish it.

4           There was long planning.  Mr. Harness was

5   involved in arranging to purchase pills through repeated

6   telephone calls over a period of weeks; and then finally

7   the purchase was to be accomplished on May 31st, 2010.

8           As to the other factors surrounding this crime,

9   there's some suggestion of violence.  The record does not,

10  I think, support a specific finding that Mr. Harness had

11  any violent intent.  There doesn't appear to have been a

12  firearm involved.  As to snatching the pills, that appears

13  to be somewhat ambiguous.

14          Mr. Harness seems to have said he had a limited

15  amount of money, perhaps $800, and that he intended to

16  snatch the pills.  However, there's some question of

17  whether he really had more money up to $8800; but

18  Mr. Harness did state his intention of snatching the pills

19  in the undisputed facts at paragraph 16 of the presentence

20  report.

21          Whether he would have done that or not, I have

22  no idea; and I can't determine from this record whether he

23  would have.  There is an aspect of this crime that in the

24  civil law we used to call puffery.  In other words, it's

25  apparent that Mr. Harness had a tendency -- I don't want

1   to call it bragging but a tendency to exaggerate his

2   activities and in a way his culpability.  Not only is that

3   reflected in part in paragraph 16 but you can find it at

4   paragraph 7 where Mr. Harness said he was -- he could sell

5   5,000 to 10,000 Lortab in a couple of days; 1,000 to 5,000

6   Oxycontin, depending on the price of the pill.

7          And he's quoted as saying, "It ain't nothing

8   for me to make five or ten a week," meaning five or

9   $10,000 a week; but if he was making five or $10,000 a

10  week, he wouldn't be riding down to Memphis with $800 in

11  his pocket to buy some Oxycontin he couldn't afford.  So,

12  I'm assuming that he is unlikely to have been operating at

13  that stage.  That's what I call puffery.

14          The kind of talk -- I've encountered it.  I

15  know Mr. Kitchen has, and I know Mr. Bell has.  People who

16  are dealing drugs will brag to one another to some extent

17  what they're doing and how much money they have and how

18  successful they are, and Mr. Harness was clearly dealing

19  in drugs.  He simply wasn't dealing in drugs at that

20  level.

21          So, we have a very serious crime.  It's a crime

22  that was planned and executed by Mr. Harness.  He had some

23  assistance from others, but that assistance was at least

24  in part unknowing.

25          There is no indication that he intended

violence; but unfortunately in drug transactions of this sort, violence often accompanies those transactions.  Even though people don't set out to engage in violence, there are other people involved in the drug trade who do; and guns and drugs go together like love and marriage.  That's simply how the drug trade operates.

         Mr. Harness didn't have a gun apparently, but others well could have.  So, by undertaking this transaction, Mr. Harness created a situation where there was a serious possibility of violence.

         As to the relevant conduct, I consider the relevant conduct at paragraphs 22 and 23 only for the fact that Mr. Harness was arrested and as part of the overall process that he was arrested in that case; and what he was charged with, well, are simply facts, facts of which I can take judicial notice.  He was indicted by a grand jury in Davidson County Criminal Court, and the grand jury of necessity found that Mr. Harness and others committed a crime.  They found that there was probable cause to believe that he committed that crime.

         Whether he committed that crime or not is not a matter before me.  I consider the indictment and what's charged against Mr. Harness solely for the point of dealing with this case as a whole.  I do not consider it as part of his sentencing, and the reason for that is I

1   don't have sufficiently reliable information before me

2   about whether Mr. Harness committed this crime.  So, I

3   can't rely on it as part of relevant conduct.

4          Now, of course, Mr. Kitchen could put on proof

5   about the crime, should he choose to do so, which he

6   hasn't and he reasonably would not and I could decide by a

7   preponderance of the evidence that Mr. Harness did this

8   and consider it but I don't have that proof before me and

9   so it's not appropriate for me to consider that.

10         It is troubling that he was arrested and

11  arrested after this crime and it's troubling that it's a

12  cocaine crime but, again, it is not something I will be

13  considering in sentencing because it does not have

14  sufficient reliability for me to consider it and -- well,

15  that's enough.  So, that's the crime.

16         Now, one of the reasons that I think every

17  judge I've ever known says that this is the most difficult

18  thing he or she does is that one comes to consider the

19  human being before one, Mr. Harness, who's 31 years old.

20  He has five children.

21         He has a significant criminal history.  His

22  history began when he was a young -- a child.  It began

23  when -- well, a young person.  Let's say that.  He was

24  16 years old, and he had a complaint sustained in the

25  juvenile court in Davidson County for aggravated assault.

UNREDACTED TRANSCRIPT

He was charged with aggravated kidnapping, but the record shows that that was nolle prossed.  So, it was an aggravated assault which is a serious crime.

He was charged again in the juvenile court in Nashville, the juvenile court for Davidson County, with vandalism; and that was sustained.  Other matters were nolle prossed, but he was guilty of vandalism.

I don't know the nature of the aggravated assault or of the vandalism, but they're very serious matters.

His first adult conviction was when he was 18 and he unlawfully possessed a weapon, a .9 millimeter semiautomatic handgun loaded with a round in the chamber under his seat.  They were looking for a vehicle that was suspected in a robbery, they, the police; and they found the defendant in it.  There's no indication in the record that the defendant was engaged in any robbery, but he did unlawfully possess the handgun.  It was a misdemeanor, a fine and a weapons forfeiture.

At 18, he was also guilty of theft of property and at 21, possession of a controlled substance and unlawful possession of a weapon.  That's the case where his probation was revoked and he was -- but ultimately the revocation was dismissed after about most likely eight or nine months.

1     There's another instance of unlawful possession

2 of a weapon, and he was guilty of sale of marijuana and

3 reckless endangerment.  That's all set out in paragraph 45

4 of the presentence report.

5     He recklessly engaged in conduct that placed or

6 might have placed a bystander in imminent danger of death

7 or serious bodily injury committed with a motor vehicle.

8 That's the case where Mr. Harness refused to stop and

9 finally stopped at -- was stopped at gunpoint and he had a

10 quarter of a pound of marijuana.

11     So, the criminal history total is five.

12 Mr. Harness is in Criminal History Category III.  That's a

13 significant criminal history.

14     Mr. Bell makes the point -- and it's

15 well-taken -- that from 2002 until 2010 when he committed

16 this offense that Mr. Harness managed to stay out of

17 trouble.  He apparently lived a law-abiding life.  He

18 turned his life around to some extent.  He started trying

19 to take classes.  In fact, he took classes.  He went to

20 work.  He got a record contract.  He attempted to deal

21 with his drug addiction with some success; and then, as

22 they say, he fell off the wagon.

23     That seems to have happened with this case.  It

24 happened earlier than this case because he didn't just

25 fall into this situation; but by the relevant dates here

1   in March of 2010, Mr. Harness was actively engaged in

2   purchasing and selling Oxycontin.

3            There are two categories of people I see who

4   are drug dealers.  That's something of an

5   oversimplification, but there's one group of people for

6   whom it's a business.  It's like getting up every morning

7   and going to the office.  They don't have any personal

8   relationship with drugs beyond buying and selling them.

9            There are other people whose involvement with

10  drugs arises from their own addiction and, in part,

11  they're buying and selling drugs to feed their addiction

12  and that's what's happening here.  Mr. Harness was himself

13  addicted to Oxycontin, and part of the reason he was

14  buying and selling these drugs was to feed his own

15  addiction.

16           One sees it relatively often.  Sometimes people

17  try to begin at a low level or they do begin at a low

18  level and it just gets out of control and that may be what

19  happened here.

20           Mr. Harness is, as I say, 31 years old.  He was

21  11 when his father committed suicide.  His mother

22  fundamentally reared him.  He was in a single-parent

23  household.  He spent a good bit of time alone in his home

24  as his mother was gone.  He has siblings including.

25           He had something of a difficult childhood.  His

childhood was, I would say, less difficult -- it's hard to
quantify these things -- less difficult than most people I
sentence.  Let's put it that way.  He had more
opportunities than many people I sentence who grow up on
the streets and have nothing.  They don't have any
parents.  They don't have fathers or mothers or sometimes
even grandparents.  They live their lives in a gang
environment and begin selling drugs at an early age.

     Mr. Harness did begin crime at an early age but
he is -- his situation was better than many people I see.
I'm not saying his situation was good.  Obviously, it
wasn't.

     He's married.  He has three children by his
present wife.  He had two children with Ms. Hayes.  His
present wife, Ms. Candace Harness, has spoken today, as
has the mother of two of his five children, Ms. Stephanie
Hayes.  They've both spoken very highly of Mr. Harness
about his abilities as a parent and as a husband and as a
good person.

     And I've also heard from Mr. DeFord who is
Mr. Harness' friend for many years.

     I've read a number of letters which are
attached to Mr. Bell's filing.  I've read all of the
things that were submitted to me.  Some are more
persuasive than others, but I think it's fair to say that

1    no one who knows Mr. Harness or at least no one who knows

2    Mr. Harness who's come forward doesn't believe that

3    Mr. Harness is a good human being who's made an effort and

4    who's been a good parent and a good spouse.

5            Mr. Harness is apparently in good health.  He's

6    made some efforts recently to improve his health through

7    diet and exercise and has lost substantial weight.

8            There is some evidence of Posttraumatic Stress

9    Disorder from 2001.  There's nothing since that indicates

10   any evaluation or any treatment.

11           He did complete, as Mr. Bell has pointed out, a

12   domestic violence program for perpetrators.

13           There's a long history of substance abuse here.

14   Mr. Harness began drinking alcohol when he was 12.  He

15   started smoking marijuana when he was 10 and smoked daily

16   until he was 22.  He used cocaine for several years and

17   then he began using pills -- Oxycodone, Hydrocodone, and

18   Xanax -- around the time he was 20 and he was taking pills

19   every day.

20           He did maintain his sobriety apparently from a

21   period between 2001 and 2006.  He has apparently a

22   successful musical career and is a talented musician.  His

23   musical career, however, appears to have been partly

24   responsible for his return to illegal substances which is

25   very unfortunate.

1         Apparently, Mr. Harness completed a treatment

2  program at New Avenues in 2001 and 2002.  He worked with

3  the Alcoholics Anonymous 12-step recovery program.  He

4  managed to maintain his sobriety for a long time and then

5  he relapsed and when he relapsed, he became involved again

6  in criminal activity.

7         Mr. Harness dropped out of school.  Apparently

8  he's an intelligent, capable person.  He got his GED.

9  He's a cook and, as I say, a musician.  He has a history

10  of recording contracts on several occasions and has been

11  able to make some money from his recording career and from

12  his musical career, although it's not enough to, I

13  suspect, support five children.  There have been periods

14  of unemployment and employment in other capacities as a

15  kitchen manager, as a chef apprentice at the Bluegrass

16  country club which I assume is ironically named.

17         So, there's good here; and there's bad here

18  like most people.  Unfortunately, the crime is a serious

19  one.

20         Since he's been on pretrial release, the report

21  at Document 50 dated January 24th, 2012, states that

22  Mr. Harness has been compliant as to his reporting and

23  that his drug screens have been negative.  He's also

24  attended outpatient substance abuse treatment at

25  Cornerstone.  Unfortunately, he was arrested and indicted

UNREDACTED TRANSCRIPT

1   for additional criminal activity during this same period.

2          Mr. Bell argues that Mr. Harness is more than a

3   perpetrator of a crime.  I understand that.  I've

4   sentenced hundreds and perhaps thousands of people and I

5   understand that people who come before me are human beings

6   and they're not just statistics or numbers or labels but

7   the commission of a crime, especially a crime of this

8   magnitude, is a powerful thing.  I don't sentence evil

9   people.  I've said this many times.  When you do this as

10  long as I have, you learn about people; and there aren't

11  many evil people in the world.  There are good people who

12  do stupid things, and that's what we have here.

13         Mr. Harness is a good person, and he's made a

14  series of terrible choices in his life.  He's made some

15  good choices in his life but he's made some terrible

16  choices and bad choices have consequences.  They not only

17  have consequences for you, they have consequences for

18  people you love.  I've said also many times I don't

19  sentence only a defendant, I sentence a family because the

20  family feels the consequences often in ways more

21  significant than the defendant, particularly children.

22         So, I have a very serious crime in which

23  Mr. Harness was centrally involved.  There's a strong need

24  for deterrence because people who distribute illegal

25  substances are pouring poison into the community.

UNREDACTED TRANSCRIPT

1          Is there a need to protect the public from
2   Mr. Harness?  That's a difficult question on this record.
3   I think Mr. Harness wants to be a good, law-abiding
4   citizen.  He has the capacity to do that, but whether he
5   can do it and will do it is part of him.  He's the only
6   person who can decide.  He's had the opportunity several
7   times to do that and has not done it.  He had the
8   opportunity over a period of five years where he was
9   apparently a good and productive citizen and then became
10  involved in this criminal activity.

11          So, there is a need to protect the public here,
12  although I think Mr. Harness truly wants to do better and
13  has given an example of his effort and his ability to do
14  better, but drugs are powerful things and Mr. Harness has
15  a long history of addiction to multiple substances.  It's
16  not easy to stop, and this case demonstrates that.

17          Can Mr. Harness benefit from incarceration?  To
18  some extent he can.  He certainly needs drug treatment in
19  a stable environment but, otherwise, probably not.  He
20  already has his GED.  He has skills.  He's a talented
21  musician.  I assume he's a talented musician.  My musical
22  taste is very limited.  So, I'm really not able to judge
23  whether he's a talented musician; but certainly other
24  people in the business which he's chosen believe he's a
25  talented musician.  Based on me review of his supporting

1   e-mails and letters, he has a substantial fan base; and I

2   assume there are people out there who have good taste in

3   music who understand these things that I don't understand.

4          What about the guidelines?  They seem to work

5   on the face here, the case.  They recognize the

6   seriousness of the offense.  They recognize the criminal

7   history.  They recognize the acceptance of responsibility.

8   They never recognize the human being before one and they

9   simply don't but they seem to work here and they seem to

10  promote uniformity but I think a low-end sentence is the

11  appropriate sentence.

12         I have some concern about the guidelines, but

13  this is clearly a case for incarceration.  This is not a

14  case for probation or time served or anything such as that

15  because of the seriousness of the offense and the need for

16  deterrence.  I'm mildly concerned that the low end's a

17  little high, but I certainly would not go above the low

18  end in sentencing.

19         Anything else you want to say, Mr. Bell, before

20  we proceed?

21         MR. BELL:  Your Honor, we understand the

22  Court's position and we would ask, as I stated earlier, we

23  would ask for a variance based on the factors we've set

24  forward so far and just ask your Honor to take that into

25  consideration but we understand that the Court has settled

1   on an incarceration sentence.

2            We also would ask that as any part of that

3   incarceration sentence that your Honor do recommend that

4   Mr. Harness go to the 500-hour drug program.  He seems

5   like a good case for that type of thing.

6            THE COURT:  He needs that program and can

7   benefit from that program.  I will recommend him for that

8   program.

9            Anything else you want to say, Mr. Kitchen?

10           MR. KITCHEN:  I agree with the 57 months, your

11  Honor.

12           THE COURT:  All right.  Well, that's what I'm

13  going to do.  I think a low-end sentence is appropriate

14  because of Mr. Harness' efforts and because of his -- the

15  interruption in his treatment which indicates to me he's

16  made an effort but the effort was inadequate.

17           Fifty-seven months; three years supervised

18  release; no fine based on inability to pay and the length

19  of the sentence; no restitution; mandatory special

20  assessment of $100.

21           As conditions of supervised release,

22  Mr. Harness needs to cooperate in the collection of DNA as

23  directed by his probation officer.

24           He needs to cooperate in drug testing and

25  treatment as directed by his probation officer.

UNREDACTED TRANSCRIPT

1          He needs to cooperate in mental health

2   treatment as directed by his probation officer.

3          And he needs to maintain lawful, full-time

4   employment.

5          I will recommend Mr. Harness for the 500-Hour

6   Drug Treatment Program; and I will recommend that

7   Mr. Harness be placed as close to his family in Nashville,

8   Tennessee, as possible or at least in the Nashville area.

9          Mr. Harness, this is a difficult sentence; and

10  it's difficult for me as a judge to impose it.  It's

11  difficult for me to impose any sentence, but it's

12  particularly difficult for me because there's a disconnect

13  between this crime and the kind of person you are.

14         I understand you're a good person.  All these

15  people wouldn't be here if you weren't.  I understand

16  you're a good husband and a good father but I have another

17  job, too, and that's to protect society and protect the

18  public.

19         The crime here is so serious that I can't

20  simply pass over it, but you're a young man.  You have a

21  long future ahead of you.  You've shown in the past that

22  you can overcome these problems.  You can overcome this

23  problem.  I believe it absolutely.  It's up to you to do

24  that.  No one can do it for you.  You certainly have every

25  incentive to do it with five children who are dependent on

1   you.

2           So, I wish you well.  I think you can leave and

3   become a good citizen, and I certainly hope you'll have a

4   great career.

5           Is there anything else, Mr. Bell?

6           MR. BELL:  No, your Honor.

7           MR. KITCHEN:  No, your Honor.

8           THE COURT:  Mr. Kitchen.

9           Thank you very much.  You're excused.

10          MR. BELL:  Your Honor, I am --

11          THE COURT:  Oh, he has the right to appeal.

12          Mr. Harness, you have the right to appeal your

13  sentence.  You have the right to apply for leave to appeal

14  in forma pauperis.  Ms. Lee is going to hand the appeal

15  papers to Mr. Bell so that you can take an appeal if you

16  want to.  In forma pauperis just means you do not have to

17  pay to appeal.

18          Is there anything I haven't considered,

19  Mr. Bell, that you have -- anything you haven't already

20  argued that I haven't considered?

21          MR. BELL:  No, your Honor.  Through the

22  position paper and what we've talked about so far I have.

23          I did want --

24          THE COURT:  Have I addressed everything you

25  want me to address?

1          MR. BELL:  Yes, you have.

2          THE COURT:  Mr. Kitchen?

3          MR. KITCHEN:  You did, your Honor.  Thank you.

4          MR. BELL:  I am asking -- I want to submit the

5   to the Court we had a number of different DVDs.  I wanted

6   to make a part of the record the DVD we played.  I have

7   submitted that to the Court as one of the exhibits.

8          THE COURT:  You're not submitting anything you

9   haven't played.

10          MR. BELL:  No, that's the same one.  It's just

11   a copy of it.

12          THE COURT:  All right.  That will be made

13   collective -- well, that will be made Exhibit 1 to these

14   proceedings without objection.

15          (Exhibit No. 1 was received.  Description:

16   DVD.)

17          MR. BELL:  Yes.

18          THE COURT:  Now, I'm assuming that your letters

19   are also part of the record.

20          MR. BELL:  That's right.  That's --

21          THE COURT:  And they were attached to your

22   position which is filed in Document 49, and the letters

23   should be filed at 49-1 for the record.

24          MR. BELL:  That's right.

25          THE COURT:  All right.  Mr. Bell, do you know

UNREDACTED TRANSCRIPT

 1   of any reason, other than any reason you've already

 2   argued, why the sentence should not be imposed as stated?

 3              MR. BELL:  No, your Honor.

 4              THE COURT:  Probation.

 5              MR. KITCHEN:  No, your Honor.

 6              PROBATION OFFICER:  No, your Honor.

 7              THE COURT:  Mr. Kitchen?

 8              MR. KITCHEN:  No, your Honor.

 9              THE COURT:  Thank you.

10              The Court will impose the sentence as stated.

11              You have the right to appeal.  Thank you,

12   Mr. Harness.

13              COURTROOM DEPUTY:  Do you move to dismiss

14   Count Two?

15              MR. KITCHEN:  I apologize.  I do move to

16   dismiss any remaining counts, your Honor.

17              THE COURT:  Count Two is dismissed on motion of

18   the Government.

19              Anything else?

20              MR. BELL:  No, your Honor.  Thank you.

21              MR. KITCHEN:  Thank you for reminding me.

22              THE COURT:  Thank you.

23              Do you have anything else, Mr. Bell?

24              MR. BELL:  Thank you, your Honor.

25              THE COURT:  Thank you.

UNREDACTED TRANSCRIPT

1          (Whereupon the proceedings adjourned.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

       I, Nicole M. Warren, RMR, CRR, do hereby
certify that the foregoing pages are unredacted and to the
best of my knowledge, skill, and ability are a true and
accurate transcript from my stenotype notes of the
Sentencing Hearing on January 26, 2012, in the matter of:

  United States of America vs. William Harness.

  Dated this 26th day of January, 2012.

Nicole M. Warren, RMR, CRR
Official Court Reporter
United States District Court
Western District of Tennessee